UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.B.,<br><br>                    Plaintiff,<br><br>          v.<br><br>Martin O'Malley,<br><br>                    Defendant. | Case No.  22-cv-05579-LJC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 19, 24 |

Plaintiff C.B.[1] challenges the final decision of Defendant Martin O'Malley, Commissioner of Social Security (the Commissioner),[2] denying her application for disability insurance benefits under Title II of the Social Security Act.  Both parties consented to magistrate judge jurisdiction (ECF Nos. 9, 10) and moved for summary judgment.  ECF Nos. 19, 24.  Having considered the parties' briefing, and for the reasons discussed below, C.B.'s Motion for Summary Judgment is **GRANTED**, the Commissioner's Cross-Motion for Summary Judgment is **DENIED**, and this matter is **REMANDED** for further proceedings.

I.      BACKGROUND

C.B. is a 50-year-old woman who suffers from several medical and psychological impairments, including chronic fatigue syndrome (CFS) related to chronic Bartonella and Babesia infections, fibromyalgia, cognitive dysfunction, anxiety disorder, complex post-traumatic stress

---

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials.  This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Martin O'Malley was sworn in as Commissioner of Social Security on December 20, 2023, and is therefore automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

disorder (PTSD), and depression.  ECF Nos. 12-4 at 2–3, 12-11 at 10.[3]  Her medical records

contain numerous provider assessments that consistently describe C.B.'s symptoms in association

with her CFS and fibromyalgia diagnoses.  *See, e.g.*, ECF No. 12-8 at 41, 481, 505.  The Centers

for Disease Control and Prevention (CDC) describes CFS as a "disabling and complex illness,"

symptoms of which include severe fatigue, post-exertional malaise, sleep disturbance, impaired

memory or ability to concentrate, pain, and dizziness.  *See* CDC, What is ME/CFS?,

https://www.cdc.gov/me-cfs/about/index.html (last reviewed Mar. 21, 2023).   It defines

fibromyalgia as "a condition that causes pain all over the body (also referred to as widespread

pain), sleep problems, fatigue, and often emotional and mental distress."  *See* CDC, Fibromyalgia,

https://www.cdc.gov/arthritis/basics/fibromyalgia.htm (last reviewed May 25, 2022).  C.B. was

diagnosed with CFS as early as 2018, with symptom onset in 2015–2016, and officially diagnosed

with fibromyalgia sometime in 2020.  ECF No. 12-8 at 481, 486.

On October 22, 2018, C.B. filed an application for disability insurance benefits.  ECF No.

12-3 at 18.  The claim was initially denied on January 4, 2019, and upon reconsideration on May

16, 2019.  *Id.*  In October 2020, C.B. underwent a pacemaker implantation to treat her irregular

heart palpitations and potentially her severe fatigue.  ECF No. 12-14 at 70.  There were no

complications, and in November 2020, C.B. reported improvement in her chest discomfort

symptoms and was found to not be pacemaker dependent, although she continued to report daily

fatigue in the months after the procedure.  ECF Nos. 12-7 at 130–31, 12-13 at 341, 393.

After the denial upon reconsideration, C.B. filed a written request for a hearing and the

administrative law judge (ALJ) held a telephonic hearing on June 22, 2021.  ECF No. 12-3 at 18.

C.B. testified and vocational expert Luis Mas testified before the ALJ.  *Id.*  On August 31, 2021,

the ALJ issued a written decision finding that although C.B. is unable to perform any past relevant

work because of her medical and psychological impairments, considering her age, education, work

experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that C.B. can perform.  *Id.* at 33–34.  As to her RFC, the ALJ found that she can

---

[3] Unless specified otherwise, the Court refers to the PDF page number generated by the Court's e-filing system.

1   perform sedentary work as defined in 20 C.F.R. § 404.1567(a), which requires in part "the ability

2   to lift/carry up to 10 pounds occasionally and 5 pounds frequently," "stand and walk up to 2 hours

3   cumulatively in an 8-hour workday," "occasional climbing of ramps and stairs," and "frequent

4   stooping, kneeling, crouching, and crawling." *Id.* at 25–26.  Based on the vocational expert's

5   testimony, the ALJ found that C.B. can perform the requirements of "unskilled" and "sedentary"

6   occupations such as "lens gauger," "addresser," and "circuit board assembler." *Id.* at 34.

7          C.B. appealed the ALJ's decision to the Appeals Council on October 21, 2021.  ECF No.

8   12-5 at 104–08.  The Appeals Council issued a denial of the Request for Review on August 19,

9   2022.  ECF No. 12-3 at 2–8.  At that point, the ALJ's decision became the final decision of the

10   Commissioner pursuant to 42 U.S.C. § 405(g).

11   **II.      STANDARD OF REVIEW**

12          Under Title II of the Social Security Act, disability insurance benefits are available when

13   an eligible claimant is unable to "engage in any substantial gainful activity by reason of any

14   medically determinable physical or mental impairment . . . which has lasted or can be expected to

15   last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  To

16   determine a claimant's eligibility for benefits, the ALJ engages in a five-step sequential evaluation

17   process.  20 C.F.R. § 404.1520(a)(1).[4]  To establish disability, the claimant bears the burden of

18   showing (1) that they are not working; (2) that they have a severe physical or mental impairment

19   or a combination of impairment(s) that is severe; (3) that the impairment(s) meet or equal the

20   requirements of a listed impairment; and (4) that their RFC precludes them from performing their

21   past relevant work.  *Id.* § 404.1520(a)(4).  At step five, the burden shifts to the Commissioner to

22   show that the claimant has the RFC to perform other work that exists in significant numbers in the

23   national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).  If the Commissioner

24   conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process,

25   he does not proceed to the next step.  20 C.F.R. § 404.1520(a)(4).

26          Pursuant to 42 U.S.C. § 405(g), a district court has authority to review the Commissioner's

27

28   ───────────────
[4] Because the Title II and Title XVI regulations are identical, only the Title II regulations are cited herein.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   decision to deny disability benefits to a claimant.  "The ALJ is responsible for determining

2   credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Ahearn v.*

3   *Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

4   Cir. 1995)).  The district court's role is "to ensure that the [ALJ's] decision was supported by

5   substantial evidence and a correct application of the law."  *Ludwig v. Astrue*, 681 F.3d 1047, 1051

6   (9th Cir. 2012).  "'Substantial evidence' means more than a mere scintilla, but less than a

7   preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to

8   support a conclusion."  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  The

9   Court must "consider the entire record as a whole, 'weighing both the evidence that supports and

10  the evidence that detracts from the Commissioner's conclusion.'"  *Lingenfelter v. Astrue*, 504 F.3d

11  1028, 1035 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).

12  "Where the evidence can reasonably support either affirming or reversing the decision, [this

13  Court] may not substitute [its] judgment for that of the Commissioner."  *Parra v. Astrue*, 481 F.3d

14  742, 746 (9th Cir. 2007).

15  **III.    DISCUSSION**

16          C.B. raises four challenges to the ALJ's decision.  First, she argues that the ALJ erred in

17  her evaluation of C.B.'s subjective symptom testimony.  Second, C.B. argues that the ALJ erred in

18  her evaluation of the medical opinion evidence.  Third, C.B. argues that the ALJ erred in the

19  evaluation of the lay witness testimony, specifically, the testimony of C.B.'s partner, Beth.

20  Fourth, C.B. argues that the ALJ erred when it came to her findings at step five of the sequential

21  evaluation process.  Separately, C.B. also challenges the Appeals Council's failure to consider a

22  letter from Dr. Christopher R. Snell, dated September 14, 2020.

23          **A.    C.B.'s Subjective Symptom Testimony**

24          With respect to the second step in the ALJ's five-step sequential evaluation process, C.B.

25  has challenged the ALJ's evaluation of her subjective testimony regarding the severity of her

26  impairments.  This particular challenge requires the Court to address the applicable standard for

27  evaluating the claimant's credibility.  In the Cross-Motion for Summary Judgment, the

28  Commissioner does not cite to the "clear and convincing reasons" standard when analyzing the

4

1    ALJ's evaluation of C.B.'s subjective symptom testimony.  Instead, the Commissioner argues that

2    "[u]nder the substantial evidence standard of review, the Court should uphold the ALJ's findings

3    [as to C.B.'s subjective symptom complaints]."  ECF No. 24 at 10.  C.B. claims that the

4    Commissioner improperly focuses on the "substantial evidence" standard of review "in order to

5    avoid the much higher standard of review that this circuit demands when evaluating a claimant's

6    symptoms and testimony."  ECF No. 25 at 2.  This Court is bound by Ninth Circuit precedent and

7    applies the "clear and convincing reasons" standard, as explained below.

8    The Ninth Circuit has "established a two-step analysis for determining the extent to which

9    a claimant's symptom testimony must be credited."  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th

10   Cir. 2017).  "First, the ALJ must determine whether the claimant has presented objective medical

11   evidence of an underlying impairment which could reasonably be expected to produce the pain or

12   other symptoms alleged."  *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir.

13   2014)).   If the claimant meets this requirement and there is no evidence of malingering, "the ALJ

14   can reject the claimant's testimony about the severity of her symptoms only by offering specific,

15   clear and convincing reasons for doing so.  This is not an easy requirement to meet: The clear and

16   convincing standard is the most demanding required in Social Security cases."  *Id.*  To satisfy the

17   "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ

18   must identify what testimony is not credible and what evidence undermines the claimant's

19   complaints."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick*, 157

20   F.3d at 722).

21   In weighing the claimant's credibility, the ALJ may consider many factors, including "(1)

22   ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior

23   inconsistent statements concerning the symptoms, and other testimony by the claimant that

24   appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to

25   follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v.

26   Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th

27   Cir. 1996)).  The ALJ's reasons also must be supported by substantial evidence in the record.

28   Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

United States District Court
Northern District of California

1    Here, the ALJ found at step two of the five-step sequential evaluation process that C.B. has

2    several, medically determinable severe impairments, including, *inter alia*, CFS, fibromyalgia,

3    PTSD, depression, and general anxiety disorder.  ECF No. 12-3 at 20.  The ALJ made no finding

4    that C.B. was malingering and found that C.B.'s "medically determinable impairments could

5    reasonably be expected to cause the alleged symptoms."  *Id.* at 33.  Therefore, the ALJ could

6    reject C.B.'s "testimony about the severity of her symptoms only by offering specific, clear and

7    convincing reasons for doing so."  *Trevizo*, 871 F.3d at 678.

8    The ALJ gave several reasons for rejecting C.B.'s symptom complaints, none of which

9    meet the "clear and convincing reasons" standard.

10                **1.    C.B.'s Daily Activities**

11   The ALJ rejected C.B.'s testimony as to her CFS and fibromyalgia symptoms in part

12   because she "reported a relatively full range of daily activities" such as "preparing simple meals,

13   doing small amounts of laundry, cleaning, doing the dishes, vacuuming," etc.  ECF No. 12-3 at 33.

14   But "[d]aily activity may be grounds for an adverse credibility finding only if it meets the

15   threshold for transferable work skills or contradicts [the p]laintiff's testimony," and "[a]ctivities

16   such as '[h]ouse chores, cooking simple meals, self-grooming, paying bills, writing checks…as

17   well as occasional shopping outside the home, are not similar to typical work responsibilities.'"

18   *Baig v. Kijakazi*, No. 21-CV-01839-HSG, 2023 WL 3688453, at *8 (N.D. Cal. May 26, 2023)

19   (quoting *Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017)).  The Ninth Circuit has

20   repeatedly recognized that "many home activities are not easily transferable to what may be the

21   more grueling environment of the workplace, where it might be impossible to periodically rest or

22   take medication."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989), *superseded on other grounds

23   by* 20 C.F.R. § 404.1502(a).  The ability to "periodically rest" at home in between daily activities

24   is especially important for individuals with CFS and fibromyalgia.  *See Reddick*, 157 F.3d at 722

25   (holding that the ALJ erred in finding that the claimant's daily activities indicated an ability to

26   work where activities "were sporadic and punctuated with rest," which is consistent with CFS).

27   C.B.'s statements regarding her daily activities do not contradict her testimony as to her

28   CFS and fibromyalgia symptoms.  She testified that her pain is "inconsistent" and "some days"

United States District Court
Northern District of California

6

her back pain is so bad that she can "barely even stand up." ECF No. 12-3 at 69. C.B. referred to these bouts of pain as "episodes" that sometimes happen close together and can go on for several days. *Id.* She also completed a Social Security Administration (SSA) Function Report on April 22, 2019, which states that although she tries to go outside daily, she often must stay inside to rest for two to four days a week because she is "too fatigued and sick." ECF No. 12-7 at 78. C.B. reported that she must do household chores "one at a time" and "spread them out over longer periods of time." *Id.* at 77. Her grocery shopping trips are usually only thirty minutes, including driving and shopping time. *Id.* at 78. Although C.B. may engage in the daily activities highlighted by the ALJ, these are "sporadic and punctuated with rest," which is to be expected for individuals with CFS. *Reddick*, 157 F.3d at 722; *see also Hatcher v. Apfel*, No. C98-03453WHA, 1999 WL 1029858, at *5 (N.D. Cal. Nov. 9, 1999) ("[T]he limitations in [the plaintiff's] activities reported at the hearing, to her doctor, and on disability forms are consistent with each other and with the symptoms of CFS.")

The Commissioner argues that "[e]ven where [a claimant's daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." ECF No. 24 at 12 (quoting *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012)). But C.B. is not alleging that her CFS or fibromyalgia are "totally debilitating impairment[s]" that render her completely immobile and unable to engage in typical daily activities such as cooking, cleaning, and grocery shopping. *Molina*, 674 F.3d at 1113. Her statements and testimony are that she can only engage in such activities sporadically when she has ample opportunity to rest and recover. "[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722. Moreover, "[e]ven more prolonged undertakings might be consistent with [CFS as it] is characterized by periods of exacerbation and remission." *Id.* (internal quotation marks and citation omitted); *see also Lee v. Kijakzi*, No. 222CV00068JDPSS, 2023 WL 2751985, at *5 (E.D. Cal. Mar. 31, 2023) (holding that the plaintiff's "activities of daily living do not contradict her symptom testimony or allegations of total disability" where the plaintiff had a CFS diagnosis and characterized her activities as "performed on a very limited basis, often with

1    assistance, and only as allowed by her condition") (internal citation omitted).

2                        **2.        Pacemaker Implantation**

3           Another reason the ALJ gave for rejecting C.B.'s symptom testimony with respect to her

4    CFS, anxiety disorder, PTSD, and depression was her October 2020 pacemaker implantation.  The

5    ALJ noted how the pacemaker was successfully implanted without any complications, resulted in

6    some symptom improvement, and C.B. was ultimately not deemed "pacemaker dependent."  ECF

7    No. 12-3 at 32–33.  Yet the ALJ also acknowledged the "rule-out nature" of the pacemaker (*id.* at

8    23), as documented in C.B.'s medical records, where C.B. was informed by her doctor that the

9    "pacemaker would not address many of her symptoms," only her irregular heart palpitations and

10   "potentially" her fatigue.  ECF No. 12-14 at 70.

11          C.B.'s doctor's uncertainty about the ability of the pacemaker to address many of her

12   symptoms aligns with the medical community's general understanding of CFS, which is

13   notoriously difficult to diagnose and requires that medical providers attempt to exclude other

14   possible medical causes.  *See* Social Security Ruling, SSR 14-1p: Titles II and XVI: Evaluating

15   Claims Involving Chronic Fatigue Syndrome, 2014 WL 1371245, at *2 (Apr. 3, 2014) ("In

16   accordance with the CDC case definition of CFS, a physician should make a diagnosis of CFS

17   only after alternative medical and psychiatric causes of chronic fatiguing illness have been

18   excluded") (internal quotation marks and citation omitted); *Reddick*, 157 F.3d at 724 (noting that

19   the claimant met the CDC's criteria for the diagnosis of CFS and had " underwent years of testing

20   and examination to rule out other possible illnesses.")  The fact that the pacemaker implantation

21   "ruled out" severe cardiac impairments does not discredit her symptom testimony concerning the

22   severe fatigue and pain attributable to CFS and fibromyalgia.  If anything, it bolsters the evidence

23   of CFS as an impairment by showing that the cause of her fatigue is not due to a cardiac condition.

24          Notably, the ALJ did not elaborate as to how C.B.'s pacemaker implantation is a "clear

25   and convincing reason" for rejecting her symptom testimony as to her psychological impairments,

26   such as her anxiety disorder, PTSD, and depression.  *See Fischman v. Astrue*, No. CV 08-7720-

27   RC, 2010 WL 477600, at *3 (C.D. Cal. Feb. 3, 2010) (holding that the ALJ's "grossly conclusory"

28   finding as to the plaintiff's contentions with respect to the severity of her symptoms, which "the

*United States District Court*
*Northern District of California*

ALJ did not further elaborate on," did not "provide a clear and convincing reason for rejecting plaintiff's testimony.")  Finally, the ALJ also observed that "[o]ther than the pacemaker implant, the claimant has not required extensive, invasive or inpatient treatment."  ECF No. 12-3 at 30. "[T]o the extent the ALJ suggests plaintiff's credibility is suspect because she has received only conservative treatment for her illness, this is not a clear and convincing reason for rejecting her subjective complaints in this case since no definitive treatment for [CFS] exists."  *Nelson v. Astrue*, 610 F. Supp. 2d 1070, 1077–78 (C.D. Cal. 2009) (citing *Reddick*, 157 F.3d at 727); *see also Baig*, 2023 WL 3688453, at *8 (noting that the ALJ cited no basis in support of the suggestion that the plaintiff "would need to have been hospitalized or admitted to inpatient care.")

### 3.    Mental Status Evaluation Findings

The ALJ also rejected C.B.'s statements as to her CFS, anxiety disorder, PTSD, and depression symptoms in part because "the mental status evaluation findings by treating psychiatrist Dr. Lee were consistently and invariably benign."  ECF No. 12-3 at 33.  Dr. Lee described C.B. as "pleasant and cooperative, with logical thought processes, normal attention, normal concentration, and intact memory."  *Id.* at 28.

However, the medical records that the ALJ cites to tell a different story.  There are notes from Dr. Lee alongside her mental status findings describing significant mental health symptoms that are consistent with C.B.'s psychiatric diagnoses.  *See, e.g.*, ECF No. 12-9 at 218 ("Reports triggered sometime in June – memories of trauma, couldn't sleep well… Jumpy/startle, low stress tolerance, ongoing, can only focus on 1 thing at a time.")  "Narrative sections" in mental health records can "provide pertinent details inconsistent" with a "normal" or "intact" mental status examination.  *De La Cruz v. Kijakazi*, No. 20-CV-05852-MMC, 2022 WL 1556411, at *8 (N.D. Cal. May 17, 2022).  As C.B.'s treating psychiatrist, Dr. Lee's statements "must be read in context of the overall diagnostic picture [s]he draws."  *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).  Findings that C.B. was "pleasant and cooperative" or presented with "logical thought processes" during their sessions are not inconsistent with C.B.'s statements to Dr. Lee as to the severity of her mental health symptoms.

To the extent the ALJ suggests that Dr. Lee's "benign" mental status evaluation findings

are inconsistent with C.B.'s CFS symptom testimony, the Court notes that Dr. Lee is C.B.'s treating psychiatrist, and never purported to diagnose or evaluate her CFS and/or fibromyalgia. *See Astir F. v. Comm'r of Soc. Sec.*, No. C21-1350-MAT, 2022 WL 2192922, at *4 (W.D. Wash. June 17, 2022) (holding that the "ALJ did not provide clear and convincing reasons for discounting [the p]laintiff's testimony based on" doctor's statement that her chronic pain was stable on medication where the doctor "did not treat [the p]laintiff specifically for pain management."); 20 C.F.R. § 404.1527(c)(5) (more weight is given to the medical opinion of a specialist about medical issues related to their area of specialty).  And Dr. Lee's finding that C.B.'s concentration was sometimes "normal" and her memory "intact" during their twenty-minute or so psychiatric sessions (*see, e.g.*, ECF No. 12-9 at 222) does not discredit her testimony as to cognitive difficulties significant enough to disrupt day-to-day activities.

### 4. Neuropsychological Evaluations

In terms of C.B.'s statements regarding her chronic cognitive dysfunction, the ALJ found them contradicted by the fact that she scored "on both neuropsychological evaluation[s] in June 2018 and September 2020 in the high average and even superior range of intellectual functioning on neuropsychological testing."  ECF No. 12-3 at 32.  Though the September 2020 neuropsychological evaluation from Maya Yutsis, PhD found that "C.B.'s premorbid level of intelligence was estimated to have been high average," Dr. Yutsis went on to conclude that "[t]he extent and severity of her cognitive deficits was more likely than not of sufficient severity to interfere with her ability to work in her occupation due to attention/concentration and processing speed deficits and executive deficits."  ECF No. 12-8 at 498–99; *see also id.* at 500 (attributing C.B.'s cognitive deficits in part to the "well documented and most persistent cognitive difficulties in the domains of attention and processing speed in persons with CFS….")  In the 2018 neuropsychological report from Elinor S.W. Dorsett PhD, Dr. Dorsett opined that C.B.'s "cognitive symptoms are most likely due to secondary factors such as fatigue and mood symptoms.  Both chronic fatigue and mood symptoms, both individually and in concert, are known to negatively disrupt cognitive functioning throughout daily life as well as impacting overall quality of life."  *Id.* at 518.  Thus, C.B.'s measured high average intelligence does not

1    contradict the evidence of her cognitive difficulties due to fatigue and mood symptoms.

2    Considering Dr. Yutsis's and Dr. Dorsett's neuropsychological reports in their entirety, it is clear

3    both doctors found there was objective medical evidence to corroborate C.B.'s cognitive deficits—

4    as a result of her chronic fatigue symptoms—that affect her daily functioning, which is consistent

5    with C.B.'s testimony and statements.  The ALJ improperly "cherry-picked" from Dr. Yutsis's and

6    Dr. Dorsett's reports yet ignored their conclusions as to how C.B.'s severe fatigue significantly

7    disrupts her cognitive functioning.  *See Holohan*, 246 F.3d at 1207 (concluding that the ALJ's

8    basis for rejecting the treating physician's medical opinion was not supported by substantial

9    evidence because the ALJ "selectively relied on some entries ... and ignored the many others that

10   indicated continued, severe impairment.")  Additionally, with respect to C.B.'s CFS and

11   fibromyalgia symptom testimony, the ALJ's preference for "objective clinical findings" like the

12   neurological testing over C.B.'s self-reports "contravenes this circuit's case law, which holds that

13   such reasoning 'runs counter to the [CDC's] published framework for evaluating and diagnosing

14   CFS.'"  *Lee*, 2023 WL 2751985, at *4 (quoting *Reddick*, 157 F.3d at 726); *see also Rau v.*

15   *Comm'r of Soc. Sec.*, No. 14-CV-03534-DMR, 2016 WL 705983, at *7 (N.D. Cal. Feb. 23, 2016)

16   (explaining that CFS is diagnosed based on self-reports and by ruling out other possible causes).

17           Accordingly, for all the above reasons, the Court finds that the ALJ failed to provide clear

18   and convincing reasons supported by substantial evidence for rejecting C.B.'s symptom testimony,

19   particularly her statements regarding her limitations due to CFS and fibromyalgia.

20           **B.      Medical Opinion Evidence**

21           C.B. challenges the ALJ's evaluation of medical opinion evidence from Drs. Christopher

22   R. Snell., Hector Bonilla, Steven Harris, Jennifer Sugden, S. Hanna, and D. Brodsky.  ECF No. 19

23   at 4–15.  "[A]n ALJ cannot reject an examining or treating doctor's opinion as unsupported or

24   inconsistent without providing an explanation supported by substantial evidence."  *Woods v.*

25   *Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).  In reviewing medical source opinions, an ALJ must

26   "articulate ... how persuasive" he or she finds "all of the medical opinions" based on several

27   factors.  20 C.F.R. § 404.1520c(b).  The ALJ must address the two most important factors:

28   supportability and consistency.  *Id.*  Supportability is "the extent to which a medical source

United States District Court
Northern District of California

1   supports the medical opinion by explaining the 'relevant ... objective medical evidence.'" *Woods*,

2   32 F.4th at 791 (quoting 20 C.F.R. § 404.1520c(c)(1)).  Consistency is "the extent to which a

3   medical opinion is 'consistent ... with the evidence from other medical sources and nonmedical

4   sources in the claim.'" *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

5       An ALJ may, but is not required to, explain how other factors were considered, including

6   the medical source's relationship with the claimant, the length and purpose of the treatment

7   relationship, the frequency of examinations, and the source's specialization.  20 C.F.R.

8   § 404.1520c(b)(2), (c).  If the ALJ finds that two or more medical opinions about the same issue

9   are equally well-supported and consistent with the record but are not exactly the same, then the

10  ALJ will have to articulate how it considered the other factors listed.  20 C.F.R.

11  § 404.1520c(b)(3).  An ALJ satisfies the "substantial evidence" requirement by "setting out a

12  detailed and thorough summary of the facts and conflicting clinical evidence, stating his

13  interpretation thereof, and making findings."  *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157

14  F.3d at 725).  "The ALJ must do more than state conclusions. He must set forth his own

15  interpretations and explain why they, rather than the doctors, are correct."  *Id.*

16          **1.    Dr. Snell**

17      Dr. Snell performed a Cardiopulmonary Exercise Test (CPET) over two days from March

18  9–10, 2020, to gauge C.B.'s "functional capacity and fatigue" by determining "peak oxygen

19  consumption," in connection with her CFS diagnosis.  ECF No. 12-16 at 23, 26–32.  The ALJ

20  determined that Dr. Snell's findings are "unsupported, conclusory, vague, and not persuasive," in

21  part because they "appear to include only two sentences with conclusion of work preclusions

22  while another note describes a severely positive stress test with episode of overall depletion…"

23  ECF No. 12-3 at 31.  According to the ALJ, Dr. Snell's findings "do not correlate with [C.B.'s]

24  grossly normal stress tests and cardiopulmonary findings, contained in the records from Kaiser

25  Hospital and Stanford Health Care."  *Id.*

26      Dr. Snell's medical opinion is not as vague and conclusory as the ALJ describes it.  The

27  aforementioned "two sentences" are actually the introductory paragraph in the CPET Evaluation

28  Report summarizing Dr. Snell's overall findings.  ECF No. 12-16 at 26.  He otherwise explains the

United States District Court
Northern District of California

12

1    test procedure and results and includes a more detailed summary of his findings in the CPET

2    Evaluation Report's conclusion.  *Id.* at 26–33.  Dr. Snell also describes various aspects of the

3    CPET results in substantial detail.  *See, e.g., id.* at 28 ("Peak oxygen consumption was only 66-

4    65% of predicted and below the 17.5 ml kg$^{-1}$ min$^{-1}$ [SSA] criteria for disability in cases of

5    cardiovascular disease…")  The CPET Evaluation Report is also accompanied by a four-page

6    letter from Dr. Snell further clarifying the CPET results and opining on C.B.'s functional capacity.

7    *Id.* at 22–25.  Thus, the ALJ incorrectly characterized Dr. Snell's description of the positive CPET

8    results as a "note," when in reality, Dr. Snell more than adequately supported his medical opinion

9    by explaining in detail the relevant and objective medical evidence underpinning the CPET results.

10   *See Woods*, 32 F.4th at 791.

11          Moreover, a CPET is an SSA-approved method to establish the existence and severity of a

12   medically determinable impairment because of CFS.  *See* SSR 14-1p, 2014 WL 1371245, at *5

13   (identifying "abnormal exercise stress test" as a laboratory finding that can be relied upon by the

14   SSA in its disability determination); *Clemmons v. Berryhill*, No. 18-CV-00578-EDL, 2019 WL

15   3852495, at *17 (N.D. Cal. June 27, 2019) (remanding in part because the ALJ "may not be

16   current on the international standards for incorporat[ing] CPET evaluations into assessments of

17   CFS," and noting that the ALJ should "reconsider the potential for using CPET results to diagnose

18   CFS in this case.")  The medical community's recognition of the CPET as a reputable tool in

19   assessing CFS is at odds with the ALJ's finding that Dr. Snell's opinion is "unsupported," when

20   Dr. Snell otherwise explains the "relevant ... objective medical evidence" underlying the CPET

21   data.  *Woods*, 32 F.4th at 791 (quoting 20 C.F.R. § 404.1520c(c)(1)); *see* ECF No. 12-16 at 22–23,

22   27.

23          The ALJ also determined that Dr. Snell's medical opinion did not "correlate" with records

24   from Kaiser Hospital and Stanford Health Care, which contain "grossly normal stress tests and

25   cardiopulmonary findings."  ECF No. 12-3 at 31.  The Kaiser Hospital records show that C.B.

26   underwent exercise stress tests in February 2017 (ECF No. 12-10 at 15–17) and September 2019

27   (ECF No. 12-9 at 454–56).  The February 2017 stress test results were "adequate" and showed

28   "normal heart rate response to exercise," (ECF No. 12-10 at 15), while the September 2019 stress

1    test demonstrated "[g]ood exercise tolerance" but the results were "inconclusive…due to

2    borderline ECG changes."  ECF No. 12-9 at 457.  The Stanford Health Care records show that

3    C.B. underwent a "tilt test" which was performed by neurologist Dr. Safwan Jaradeh.  *Id.* at 477–

4    79.  That test showed "mild but significant orthostatic changes," yet otherwise normal

5    cardiopulmonary results.  *Id.* at 478.  The Stanford Health Care records also document C.B.'s

6    October 2020 pacemaker implantation, and the fact that medical providers found she displayed

7    normal cardiac functioning after its implantation.  ECF No. 12-12 at 2–4, 482–84.

8         As an initial matter, according to the SSA, there are no "specific laboratory findings that

9    are widely accepted as being associated with CFS" and "standard laboratory test results in the

10   normal range are characteristic for many people with CFS," therefore, "they should not be relied

11   upon to the exclusion of all other clinical evidence in decisions regarding the presence and

12   severity of a [medically determinable impairment]."  SSR 14-1p, 2014 WL 1371245, at *4; *Lee*,

13   2023 WL 2751985, at *4 ("[A] general litany of negative lab tests does not undermine plaintiff's

14   CFS allegations, since '[t]here is no blood test or other objective laboratory test for [CFS]'")

15   (quoting *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 677 (9th Cir. 2011)).  If

16   anything, as noted above, "abnormal exercise stress tests" like the CPET are a specific type of

17   laboratory finding explicitly identified by the SSA as being associated with CFS.  SSR 14-1p,

18   2014 WL 1371245, at *4.  To the extent the ALJ suggests that "normal" cardiopulmonary test

19   results invalidate C.B.'s CPET results, this is contrary to SSR 14-1p and with the CDC's

20   "published framework for evaluating and diagnosing CFS."  *Reddick*, 157 F.3d at 726.  In this

21   respect, when evaluating the consistency of Dr. Snell's opinion with the medical evidence of

22   record, the ALJ erred in relying on evidence that is not actually inconsistent with Dr. Snell's

23   findings.

24        As for the "grossly normal stress tests," the ALJ did not explain how they are inconsistent

25   with C.B.'s CPET results.  Dr. Snell opined that the CPET is different than the September 2019

26   exercise stress test because the latter "is well known to overestimate peak oxygen consumption,"

27   and is also a one-time test that did not involve follow up with C.B. "to inquire about possible post-

28   visit symptom exacerbation."  ECF No. 12-16 at 22–23.  According to Dr. Snell, "[t]he severity of

1  ME/CFS symptoms can fluctuate during the day, from day to day, and throughout the illness," and

2  "[s]ymptoms may not occur for hours or even days after the triggering event," thus, "healthcare

3  providers may not see patients when their symptoms are most severe." *Id.* at 24.  The ALJ failed

4  to address this part of Dr. Snell's opinion.  As such, she failed to describe "the extent to which"

5  Dr. Snell's medical opinion is or is not "consistent ... with the evidence from other medical

6  sources and nonmedical sources in the claim,'" as she was required to do by the regulations.

7  *Woods*, 32 F.4th at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

8  According to C.B., "[a]ssuming, arguendo," that Dr. Snell's medical opinion and the

9  Kaiser Hospital stress test results were both "equally supported…the ALJ had an obligation to

10  articulate the other persuasiveness factors in paragraphs (c)(3) through (c)(5) of [20 C.F.R.

11  § 404.1520c]. This the ALJ failed to do."  ECF No. 19 at 8.  These factors include the length of

12  the treatment relationship, frequency of examinations, medical source specialization, etc.  20

13  C.F.R. § 404.1520c(b)(3).  The Commissioner did not address this argument in the Cross-Motion

14  for Summary Judgment.  But the Court is not convinced that Section 404.1520c(b)(3) applies in

15  this instance, given that the February 2017 and September 2019 stress test results are noted in

16  C.B.'s medical records and not necessarily a medical "opinion."  Nevertheless, the Court need not

17  determine whether the ALJ erred in her failure to evaluate the other persuasiveness factors, given

18  that the ALJ's explanation for finding Dr. Snell's opinion unpersuasive based on the mandatory

19  factors of supportability (Section 404.1520c(c)(1)) and consistency (Section 404.1520c(c)(2)) is

20  deficient and not supported by substantial evidence.

21  **2.  Dr. Bonilla**

22  Dr. Bonilla, a chronic fatigue specialist at Stanford Health Care, opined in a letter dated

23  January 20, 2021, that C.B.'s "history and symptoms are consistent with" CFS, and recommended

24  that until C.B.'s "fatigue has measurably improved…[she] refrain from any exertion, both physical

25  and cognitive… [Her] treatment plan is to limit activities, including walking, lifting, bending, and

26  similar physical exertion and cognitive tasks that require focus."  ECF No. 12-12 at 16, 19.  The

27  ALJ found Dr. Bonilla's letter not persuasive because it only reflects C.B.'s limitations since

28  December 2, 2020, which is when he first began treating C.B.  ECF No. 12-3 at 31.  The ALJ also

1    found that Dr. Bonilla's opinion is "vague as to the degree of exertional capacity remaining," and

2    what C.B. "could do now and for any continuous 12-month period." *Id.* Finally, the ALJ found

3    that "Dr. Bonilla appears to overly rely upon the subjective complaints" of C.B. *Id.*

4         The ALJ did not make any findings regarding the mandatory supportability and

5    consistency factors when evaluating the persuasiveness of Dr. Bonilla's medical opinion. 20

6    C.F.R. § 404.1520c(c)(1)–(2). Instead, she emphasized Dr. Bonilla's two-month treatment

7    relationship with C.B. ECF No. 12-3 at 31. Length of the treatment relationship is a factor that

8    the ALJ can consider, but she is not required to explain this factor in all cases, as she is required to

9    do for supportability and consistency. *See Lilita H. v. Kijakazi*, No. 21-CV-04063-JSC, 2022 WL

10   4225395, at *4 (N.D. Cal. Sept. 13, 2022) ("The ALJ must explain how he considered

11   supportability and consistency, *may* explain how he considered the relationship factors, and is not

12   required to explain the other factors") (emphasis added). The fact that Dr. Bonilla and C.B. had a

13   two-month treatment relationship does not mean that Dr. Bonilla did not properly explain the

14   relevant, objective medical evidence to support his opinion, or that his opinion is inconsistent with

15   evidence from other medical sources. The Commissioner cites to *Benton v. Barnhart*, 331 F.3d

16   1030 (9th Cir. 2003), which held that "duration of treatment relationship and frequency and nature

17   of contact [are] relevant in weighing [a medical source] opinion." *Id.* at 1038. However, the issue

18   is not the relevancy of these factors, as they are clearly relevant. The issue is that the ALJ did not

19   explain how she considered the supportability and consistency factors in evaluating Dr. Bonilla's

20   medical opinion, as she is required to do under the revised 2017 SSA regulations. *See Woods*, 32

21   F.4th at 792.

22        Nor does the ALJ's finding that Dr. Bonilla's opinion is "vague as to the degree of

23   exertional capacity remaining" (ECF No. 12-3 at 31) suggest anything about its supportability or

24   consistency. The fact that Dr. Bonilla did not opine on what type of work C.B. can or cannot not

25   do moving forward does not mean that he failed to provide objective medical evidence to support

26   what he did opine on, which is that in his "professional opinion," C.B. "meets the clinical criteria"

27   for CFS, the symptoms of which are exacerbated by physical and cognitive exertion. ECF No. 12-

28   12 at 19. To the contrary, Dr. Bonilla's letter is accompanied and informed by a detailed, eight-

United States District Court
Northern District of California

1    page initial evaluation where he reviewed C.B.'s medical records, such as her treatment history,

2    symptoms, and objective medical findings, and documented his eighty-minute, in-person

3    examination of C.B.  *Id.* at 10–17.  And the lack of detail provided as to C.B.'s exertional capacity

4    remaining does not mean that Dr. Bonilla's opinion is irreconcilable with the rest of the medical

5    evidence in the record.  The ALJ did not cite to any medical evidence as being either consistent or

6    inconsistent with Dr. Bonilla's opinion.

7            The Commissioner argues that the ALJ "properly highlighted [the fact that] Dr. Bonilla did

8    not opine permanent limitations based on [C.B.'s] condition or limitations for any continuous 12-

9    month period, but instead opined temporary restrictions."  ECF No. 24 at 15; *see* ECF No. 12-12

10   at 19 (recommending that C.B. refrain from any exertion, both physical and cognitive, "[u]ntil her

11   fatigue has measurably improved.")  She cites to *Fisher v. Berryhill*, 708 F. App'x 384 (9th Cir.

12   2017), an unpublished Ninth Circuit opinion which held that the record supported the ALJ's

13   "observation that [the doctor's] opinion does not indicate limitations that would last more than 12

14   months" and therefore was entitled to "little weight."  *Id.* at 385.  However, in Dr. Bonilla's initial

15   evaluation, he noted C.B.'s "four years history of severe and incapacitated fatigue[]," the fact that

16   her "symptoms exacerbate and [worsen] by physical activities, stress, and overstimulation," and

17   the fact that she has had "evaluations by multiple health care providers" and "received multiple

18   unsuccessful treatments."  ECF No. 12-12 at 16.  These findings do not suggest that Dr. Bonilla

19   opined only temporary restrictions for C.B.  Rather, Dr. Bonilla recommended that C.B. "[a]void

20   crash by limiting the actions that will exacerbate" her symptoms, with no indication that this is

21   meant to be only a temporary limitation.  *Id.*  To interpret Dr. Bonilla's statement as opining

22   temporary restrictions just because he made reference to C.B.'s fatigue potentially "measurably

23   improving" is inconsistent with his medical opinion as a whole, as well as with the medical

24   community's understanding of CFS, specifically, the lack of permanent treatment options.  *See*

25   *Reddick*, 157 F.3d at 727 ("[T]he CDC has made it clear that no definitive treatment for CFS

26   exists.")  Moreover, the notion that C.B. could experience some improvement as to her CFS and

27   fibromyalgia symptoms "is not inconsistent with disability."  *See Trevizo*, 871 F.3d at 680.

28           Finally, the ALJ's statement that Dr. Bonilla "overly rel[ies] upon the subjective

United States District Court
Northern District of California

1   complaints" of C.B. "cannot be the rationale for finding evidence not credible when a plaintiff

2   asserts disability based on CFS." *Baig*, 2023 WL 3688453, at *10; *Reddick*, 157 F.3d at 726

3   (citing definition of CFS in CDC report as "*self-reported* persistent or relapsing fatigue lasting six

4   or more consecutive months") (emphasis in original).  The ALJ found that the "subjective

5   symptoms" C.B. reported to Dr. Bonilla are inconsistent with her "description of daily activities of

6   living" and "are not probative as to greater limitation since they are not reflected in the overall

7   treatment record and contemporaneous medical treatment notes."  ECF No. 12-3 at 29–30.

8   However, the ALJ did not cite to any treatment notes in the record which are supposedly

9   inconsistent with the symptoms C.B. reported to Dr. Bonilla.  More importantly, the Court has

10   already rejected this line of reasoning as to the ALJ's evaluation of C.B.'s symptom testimony and

11   likewise rejects it as to the ALJ's evaluation of Dr. Bonilla's medical opinion.  *See Baig*, 2023 WL

12   3688453, at *10.

13              **3.**        **Drs. Harris and Sugden**

14        C.B. provided a medical opinion letter from Dr. Harris, co-signed by his colleague Dr.

15   Sugden of Pacific Frontier Medical, Inc. and dated May 24, 2018.  ECF No. 12-8 at 2–5.  She also

16   provided a fibromyalgia medical opinion form completed by Dr. Harris and dated August 31,

17   2020.  *Id.* at 505–13.  As to the May 2018 letter, the ALJ found that it contained "conclusory

18   statements…not supported by the contemporaneous medical record," and was "thus not

19   persuasive."  ECF No. 12-3 at 30.  She also found that Dr. Sugden's treatment notes "reflect

20   homeopathic, dietary and supplement remedies with grossly normal physical examination findings

21   and improvements in energy and pain control not requiring frequent or potent treatments or

22   medications."  *Id.*

23        As an example of a "conclusory statement," the ALJ points to Dr. Harris's opinion that

24   C.B. is "unable to perform the basic and essential duties of her position and thus is unable to

25   work…" *Id.* at 30.  But this is just one sentence towards the end of the last paragraph in Dr.

26   Harris's letter, which is three and a half pages long.  *See* ECF No. 12-8 at 2–5.  In the rest of the

27   letter, Dr. Harris describes many of C.B.'s "presenting" symptoms.  *Id.* at 2.  For example, he

28   notes C.B.'s high antibody count and low blood pressure, the latter of which indicates a "clear

United States District Court
Northern District of California

adrenal deficiency" that could be the cause of her dizziness spells which require her to sit to avoid passing out. *Id.* at 2, 4. Dr. Harris also states his and Dr. Sugden's "concerns of continued neurological deficit, that at this time is still coming and going," because of their physical exam findings documenting weakness in C.B.'s lower leg reflexes. *Id.* at 2–3. He concludes that although C.B.'s fatigue had improved, she continues to have trouble multitasking, carrying out short and detailed instructions, "deficits with sustaining concentration and attention for both short and long durations," among other specific limitations. *Id.*

The ALJ did not explain how any of these can be considered "conclusory statements." According to the Commissioner, Dr. Harris's opinion that C.B. is "unable to work… encroached upon the sole responsibility of the Commissioner to make that disability determination." ECF No. 24 at 16 (citing *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985) ("Conclusory opinions by medical experts regarding the ultimate question of disability are not binding on the ALJ.")) It is true that the ALJ is not required to credit Dr. Harris's conclusory opinion that C.B. is unable to work. This does not mean, however, that the rest of his findings as to how C.B.'s symptoms are manifesting and affecting her ability to concentrate must be rejected. And although the ALJ found that Dr. Harris's May 2018 letter is "not supported by the contemporaneous medical record," she did not cite to any specific medical records that contradict Dr. Harris's findings. As such, the ALJ once again failed to articulate how she considered the supportability and consistency factors under 20 C.F.R. § 404.1520c when evaluating Dr. Harris's medical opinion.

The ALJ also rejected Dr. Harris's May 2018 letter because of the treatment notes from Dr. Sugden, purportedly because they reflect "homeopathic, dietary and supplement remedies" and show C.B. does not require "frequent or potent treatments or medications." ECF No. 12-3 at 30. To the extent the ALJ is repudiating the alternative medicine remedies prescribed by Dr. Sugden, she did not identify any medical opinions "stating what sort of treatment *should* be expected for a totally disabled individual suffering from [C.B.'s] impairments, suggesting that the ALJ impermissibly relied on her own, lay medical opinion." *Schultz v. Colvin*, 32 F. Supp. 3d 1047, 1060 (N.D. Cal. 2014). According to C.B., she has "received all of the treatments and tests commensurate with her diagnoses including antiviral medications, Cymbalta, multiple

19

1    antidepressants, low-dose naltrexone cardiopulmonary exercise stress test, tilt table testing, and

2    cardiac medications," and "[n]otably, she had poor tolerance for all fibromyalgia medications."

3    ECF No. 25 at 5 (citing ECF No. 12-12 at 10).

4           Thus, "[t]he record reflects that [C.B.] consistently sought treatment from both her primary

5    care doctor and from a naturopathic doctor for the recognized symptoms of CFS.  The ALJ does

6    not identify a less-conservative treatment option rejected by [C.B.], and there is no indication that

7    further treatment for CFS would be fruitful."  *Lee*, 2023 WL 2751985, at *4.  As explained above,

8    fibromyalgia and CFS symptoms "wax and wane," so treatment notes that at times document

9    "improvements in energy and pain control" do not necessarily discredit C.B.'s overall complaints

10   to Dr. Sugden of debilitating fatigue.  *See Trevizo*, 871 F.3d at 680.

11          Finally, the ALJ also determined that Dr. Sugden's treatment notes contained "grossly

12   normal physical examination findings."  ECF No. 12-3 at 30.  The treatment notes she cites to

13   indicate that C.B. was "alert and oriented x 3 in no acute distress," had "regular [heart] rate and

14   rhythm," and "normal bowel sounds."  ECF No. 12-8 at 11.  However, they also note "[d]ark

15   circles under her eyes, pale, and very low energy today," "pain in muscles in her arm muscles,

16   knees and hip painful," and "bilateral knee reflexes weakness."  *Id.*  To characterize these as

17   "grossly normal physical examination findings" is misleading and "cherry-picking" Dr. Sugden's

18   treatment notes instead of reviewing them "in context of the overall diagnostic picture [s]he

19   draws."  *See Holohan*, 246 F.3d at 1205, 1207.

20          In the August 2020 fibromyalgia medical opinion form, Dr. Harris identifies C.B.'s

21   symptoms and signs of fibromyalgia (ECF No. 12-8 at 505–06) as well as her tender points (*id.* at

22   507), describes her history with CFS and which impairments have been excluded as a cause for

23   C.B.'s fatigue (*id.* at 508), notes how abnormal CPET results and "neurally mediated hypotension

24   as shown by tilt table testing" are two laboratory findings that support the CFS diagnosis (*id.* at

25   510) and opines that C.B. is limited in using her hands, fingers, and arms, and can only use them 5

26   percent of the workday (*id.* at 512).

27          The ALJ found that Dr. Harris's medical opinion form is not persuasive because it is

28   "contradicted by the valid neuropsychological testing present in the file and grossly normal mental

United States District Court
Northern District of California

status evaluation findings throughout the record." ECF No. 12-3 at 31. But as noted above, the two neuropsychological evaluations from Dr. Yutsis and Dr. Dorsett provide that C.B. has significant cognitive dysfunction, consistent with her CFS diagnosis, such that it disrupts her day-to-day life activities. ECF No. 12-8 at 498–99, 518. The ALJ did not explain how they are otherwise inconsistent with Dr. Harris's findings. And the "grossly normal mental status evaluation findings" from Dr. Lee, C.B.'s treating psychiatrist (ECF No. 12-8 at 31, 93, 99, ECF No. 12-9 at 222, ECF No. 12-10 at 179), are in the context of their psychiatric sessions, where Dr. Lee never purported to evaluate the severity of C.B.'s CFS or fibromyalgia.

### 4. Drs. Hanna and Brodsky

C.B. indirectly challenges the ALJ's evaluation of the prior administrative medical findings from Drs. Hanna and Brodsky, medical consultants for the SSA. C.B. argues that the ALJ impermissibly "played doctor by relying on her own opinion," in part because she rejected almost all the medical opinions in the record regarding C.B.'s medically determinable impairments. ECF No. 19 at 15. The only medical opinions credited by the ALJ were those of Drs. Hanna and Brodsky, and even then, the ALJ only found the opinions persuasive through May 16, 2019, given that they had no knowledge of C.B.'s fibromyalgia and CFS diagnoses and the October 2020 pacemaker implantation. ECF No. 12-3 at 30.

Dr. Hanna's medical evaluation of C.B. occurred on December 24, 2018. ECF No. 12-4 at 6–7. Dr. Hanna found that C.B.'s "[s]ubjective limitations [are] not fully supported by longitudinal objective [medical evidence of record]. After review of [medical evidence of record], [client] capable of at least light [RFC]. Fatigue considered." *Id.* at 7. Dr. Brodsky's medical evaluation of C.B. occurred on May 15, 2019. *Id.* at 22–24. Dr. Brodsky found that his review of the prior and current medical evidence of record did not indicate any "significant changes" in her condition since C.B. was evaluated by Dr. Hanna. *Id.* at 24.

According to the ALJ, the prior administrative medical findings of Drs. Hanna and Brodsky are persuasive through May 2019 "as supported by the combination of medical signs and findings for [C.B.'s] combination of severe and nonsevere physical and mental impairments." ECF No. 12-3 at 30. Once again, the ALJ did not explain how she considered the supportability

21

and consistency factors under 20 C.F.R. § 404.1520c(c)(1) and (c)(2).  In fact, the ALJ provided no more explanation than this one statement.  This is not enough to support a finding of persuasiveness.  *Garrison*, 759 F.3d at 1012 (noting that the ALJ satisfies the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  The ALJ must do more than state conclusions.") (quoting *Reddick*, 157 F.3d at 725).

### C. Lay Witness Testimony

C.B. argues that the ALJ also erred in rejecting the lay witness testimony of her partner, Beth.  ECF No. 19 at 15–16.  The ALJ found that Beth's testimony contained "sincere observations" but did not "correlate with [the] contemporaneous medical record such that they persuade as to more limitations than stated in the RFC."  ECF No. 12-3 at 33.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  "One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."  *Id.*  In addition, where the ALJ provides "clear and convincing reasons for rejecting [the claimant's] own subjective complaints," and the lay witness testimony is "similar to such complaints, it follows that the ALJ also gave germane reasons" for rejecting the lay witness testimony.  *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

The Commissioner notes how there is some uncertainty as to whether the "germane reasons" standard survived the 2017 regulatory changes.  ECF No. 24 at 20, n.3.  Under the new regulations, lay witness testimony falls under the category of "Evidence from nonmedical sources."  20 C.F.R. § 404.1513(a)(4).  There is no regulatory requirement that the ALJs articulate reasons for how they considered evidence from nonmedical sources.  *See* 20 C.F.R. § 404.1520c(d).  Although the Ninth Circuit has not addressed the issue, in *Alice B. v. Kijakazi*, No. 20-CV-05897-DMR, 2021 WL 6113000, (N.D. Cal. Dec. 27, 2021), the court held that the "'germane' reasons requirement for evaluating lay witness testimony has always been a different (and lower) standard than that required for evaluating medical opinions," therefore, "[t]he new

22

1    regulations providing that lay opinions do not need to be evaluated under the same standards as

2    medical opinions is…consistent with the Ninth Circuit's germane reasons standard." *Id.* at *8.

3         In *S.M. v. Saul*, No. 20-CV-05304-SVK, 2022 WL 958379, (N.D. Cal. Mar. 30, 2022), the

4    court cited *Alice B.* favorably, but ultimately did not "resolve any latent disagreement on this

5    point" because "the Commissioner has briefed this case under the assumption that the germane

6    reasons case law continues to apply." *Id.* at *7.  Despite the footnote, the Commissioner also

7    briefs the issue of Beth's lay witness testimony under the "germane reasons" standard.  ECF No.

8    24 at 19-20.  Because the Ninth Circuit's "germane reasons" standard is not inconsistent with the

9    revised 2017 regulatory scheme, and the Commissioner has briefed the issue applying that

10   standard, the Court will proceed in evaluating the issue of Beth's testimony under the "germane

11   reasons" framework.

12        The Commissioner argues that "the ALJ provided proper reasons for discounting [C.B.'s]

13   own testimony, thus providing a sufficient basis for rejecting third-party statements from her

14   partner as well." ECF No. 24 at 19 (citing *Valentine*, 574 F.3d at 694).  However, the ALJ did not

15   cite to C.B.'s symptom testimony as a reason for rejecting Beth's testimony.  ECF No. 12-3 at 33.

16   Even if she had, the Court already held that the ALJ did not provide "clear and convincing

17   reasons" for rejecting C.B.'s symptom testimony.  Accordingly, those reasons cannot be a

18   "sufficient basis" for rejecting Beth's testimony as well.  *See Alice B.*, 2021 WL 6113000, at *8

19   ("Because the court finds that the ALJ's reasons for rejecting [the p]laintiff's testimony were not

20   supported by substantial evidence, the court cannot apply those reasons to [the p]laintiff's

21   mother's testimony to find the error harmless.")  The ALJ simply stated that Beth's "statements do

22   not correlate with the contemporaneous medical record..." ECF No. 12-3 at 33.  But she did not

23   cite to any medical record evidence or explain where the inconsistency lies.  *See Stout v. Comm'r,*

24   *Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) ("[T]he ALJ…is required to provide

25   specific reasons for rejecting lay testimony.")  Therefore, the ALJ did not otherwise provide any

26   other "germane" reason for discounting Beth's testimony.

27        **D.     Step Five Findings**

28        At step five of the five-step sequential evaluation process, the burden shifts to the

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1  Commissioner to show that the claimant has the residual functional capacity (RFC) to perform

2  other work that exists in significant numbers in the national economy.  *Hoopai*, 499 F.3d at 1074.

3  The Commissioner can meet this burden "by the testimony of a vocational expert…" *Tackett v.*

4  *Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).  "At step five, the ALJ can call upon a vocational

5  expert to testify as to: (1) what jobs the claimant, given his or her [RFC], would be able to do; and

6  (2) the availability of such jobs in the national economy.  At the hearing, the ALJ poses

7  hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for

8  the vocational expert's consideration." *Id.*  An ALJ is "only required to accept those limitations

9  she decide[s] are applicable," and she is "free to accept or reject restrictions in a hypothetical

10  question that are not supported by substantial evidence." *Denman Thompson v. Colvin*, No. 13-

11  CV-04242-NJV, 2014 WL 12487664, at *10 (N.D. Cal. Apr. 29, 2014) (quoting *Osenbrock v.*

12  *Apfel*, 240 F.3d 1157, 1164–65 (9th Cir. 2001)).

13      Here, C.B. challenges the ALJ's determination at step five that she can perform sedentary,

14  unskilled work.  ECF No. 19 at 22–23.  The ALJ refused to adopt in her RFC finding the work

15  restrictions proposed by Drs. Bonilla, Harris, Snell, and Sugden, specifically, their opinion that

16  C.B. cannot engage in regular and sustained work activity because her post-exertional malaise

17  would require her to be frequently off task.  ECF No. 12-3 at 29–31, 82.  Instead, the ALJ found

18  that C.B. has the RFC to perform unskilled, "sedentary" work, consisting in part of "the ability to

19  lift/carry up to 10 pounds occasionally, and 5 pounds frequently," "stand and walk up to 2 hours

20  cumulatively in an 8-hour workday," and "understand, remember, and complete 3-4 step, routine,

21  but not complex tasks." *Id.* at 25–26.  At the hearing, the ALJ posed three hypothetical questions

22  to the vocational expert.  ECF No. 12-3 at 73–79.  The second hypothetical question concerned the

23  jobs available to an individual with all the limitations from C.B.'s RFC.  *Id.* at 78.  The vocational

24  expert testified that such a person can perform the requirements of "unskilled" and "sedentary"

25  occupations including lens gauger, addresser, and circuit board assembler.  *Id.*  The third

26  hypothetical question concerned the jobs available to an individual with C.B.'s RFC with the

27  additional limitation that the individual would be off task 20 percent of the workday, a restriction

28  detailed in the medical source opinions provided by C.B.  *Id.* at 79.  The vocational expert testified

24

1    that such an individual would be unemployable.  *Id.*

2        C.B. argues that "Drs. Bonilla, Harris, Snell, and Sugden all opined that [she] could not

3    complete a normal workday or workweek" and that the vocational expert "testified that a person

4    who would be off task 20% of the workday would be unemployable."  ECF No. 19 at 23.   The

5    Commissioner's response to this argument is that the hypothetical question which was ultimately

6    credited and accepted as true by the ALJ, hypothetical question number two, only included

7    "limitations that the ALJ found were supported by substantial evidence."  ECF No. 24 at 21.  That

8    is to say, the ALJ was not required to accept the vocational expert's testimony in response to

9    hypothetical question number three, since the ALJ determined that the additional limitation of

10   being off task 20 percent of the workday was not supported for C.B. by the medical evidence of

11   record.  *Id.*

12       As detailed above, the Court found that the ALJ's refusal to credit the medical opinions of

13   Drs. Bonilla, Harris, Snell, and Sugden was not supported by substantial evidence.  It is because of

14   the ALJ's rejection of these medical opinions that she accepted the vocational expert's testimony

15   in response to hypothetical number two as to an individual with C.B.'s RFC being able to perform

16   sedentary, unskilled work, over his testimony in response to hypothetical number three that an off-

17   task individual for up to 20 percent of the workday would be unemployable  "[I]f an ALJ's

18   hypothetical is based on a [RFC] assessment that does not include some of the claimant's

19   limitations, the vocational expert's testimony has no evidentiary value."  *Ghanim v. Colvin*, 763

20   F.3d 1154, 1166 (9th Cir. 2014) (internal quotation marks and citation omitted); *see also Embrey*

21   *v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) ("Hypothetical questions posed to the vocational

22   expert must set out all the limitations and restrictions of the particular claimant.")  Given the

23   ALJ's error as to the medical opinion evidence, it is possible that hypothetical question number

24   two, the hypothetical with C.B.'s RFC and the one ultimately accepted by the ALJ, did not include

25   all of C.B.'s limitations.

26       In *Ruben A. v. Saul*, No. 19-CV-03893-EMC, 2020 WL 1897578 (N.D. Cal. Apr. 16,

27   2020), the court found that the ALJ erred in discounting a treating doctor's medical opinion, which

28   in turn had a "material impact on the [vocational expert]'s testimony."  *Id.* at *6.  The treating

United States District Court
Northern District of California

United States District Court
Northern District of California

1   doctor opined that the plaintiff could sit with appropriate breaks for four hours during an eight-

2   hour workday, while the ALJ's hypothetical involved an individual who could sit six hours in an

3   eight-hour workday.  *Id.* at *5–6.  The court held that it could not "confidently conclude that the

4   outcome would have been the same absent this error because the ALJ's determination was based

5   on the [vocational expert]'s testimony, which in turn was based on the incomplete hypothetical."

6   *Id.* at *6 (quoting *Brown v. Berryhill*, No. 16-CV-04022-EMC, 2017 WL 4417516, at *9 (N.D.

7   Cal. Oct. 4, 2017)).  Because the ALJ's findings as to the medical opinions of Drs. Bonilla, Harris,

8   Snell, and Sugden were not supported by substantial evidence, the Court cannot confidently

9   conclude that the vocational expert testimony in response to hypothetical question number two,

10  which did not include the limitations these doctors opined, is not likewise incomplete.  Given all

11  the above, the Court finds that remand is appropriate on these grounds for the ALJ to make her

12  step-five determination after properly evaluating the medical opinion evidence in the record.

13          **E.**        **Appeals Council's Consideration of the September 2020 Letter from Dr. Snell**

14          Finally, C.B. argues that "[t]he Appeals Council's failure to consider the new and material

15  evidence submitted in accordance with 20 C.F.R § 404.970(b) constituted legal error."  ECF No.

16  19 at 21.  The "new and material evidence" is a letter from Dr. Snell, dated September 14, 2020,

17  written in response to an "inaccurate" medical review performed by Dr. Kristal Bright, M.D. for

18  C.B.'s long-term disability insurance carrier.  *Id.*  When the Appeals Council denied review, on

19  August 19, 2022, it found that the letter did not "show a reasonable probability that it would

20  change the outcome of the decision."  ECF No. 12-3 at 3.  The Appeals Council did "not exhibit

21  this evidence," meaning that Dr. Snell's letter is not part of the administrative record lodged by the

22  Commissioner in this case.[5]  *Id.*

23          The Appeals Council "will review a case if ... [it] receives additional evidence that is new,

24

25  _____

    [5] C.B. informed the Court that the Dr. Snell letter was not part of the administrative record in her
26  Motion for Summary Judgment when she attached a "Motion to Supplement the Record" along
    with the only copy of the letter on the Court's docket.  ECF No. 19-1.  The Court denied the
27  "motion" without prejudice because of C.B.'s failure to file it as a separate motion, as well as her
    failure to attach a proposed order and proper supporting declaration as required by the Local
28  Rules.  ECF No. 20.  The Court gave C.B. another opportunity to file her "motion," but she chose
    to not renew her request to supplement the record.

material, and relates to the period on or before the date of the hearing decision, [ ] there is a reasonable probability that the additional evidence would change the outcome of the decision," and there is "good cause" for not submitting the new evidence earlier.  20 C.F.R. § 404.970(a)(5), (b).  "Where the Appeals Council was required to consider additional evidence, but failed to do so, remand to the ALJ is appropriate so that the ALJ can reconsider its decision in light of the additional evidence." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011).  "A claimant has the burden to demonstrate the evidence should have been considered by the Appeals Council" under the SSA's regulations. *Garcia v. Saul*, No. 1:19-CV-1103-JLT, 2021 WL 223205, at *4 (E.D. Cal. Jan. 22, 2021).  However, if the Appeals Council does consider new evidence submitted by the claimant in denying review of the ALJ's decision, "the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159–60 (9th Cir. 2012).

C.B.'s challenge assumes that the Appeals Council did not consider the September 2020 letter from Dr. Snell.  However, courts in the Ninth Circuit have recognized a difference between evidence that the Appeals Council "considered" and evidence the Appeals Council merely "looked at," in determining whether the additional evidence should be incorporated into the administrative record and be subject to judicial review.  *See, e.g., Victor A. v. Kijakazi*, No. 2:21-CV-07482-GJS, 2023 WL 2614510, at *3 (C.D. Cal. Mar. 23, 2023).  "[I]f 'the Appeals Council only looked at the evidence ... the new evidence [does] not become part of the record' and the Court 'may not consider it.'" *Id.* (quoting *Amor v. Berryhill*, 743 F. App'x 145, 146 (9th Cir. 2018)).

In *Victor*, the Appeals Council used the exact same language it used in this case when denying the plaintiff's request for review based on new medical records submitted.  2023 WL 2614510, at *3 ("We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence.")  The district court held that the Appeals Council had "looked" at but not "consider[ed]" the new medical records.  *Id.*; *see also Guzman v. Kijakazi*, No. 1:20-CV-0514 JLT, 2021 WL 6062645, at *3 (E.D. Cal. Dec. 22, 2021) (interpreting Appeals Council statement that it "did not exhibit this evidence" to mean it

1  "did not consider the evidence but merely looked at it.")  The Ninth Circuit in *Amor* also found

2  that the Appeals Council only "looked" at the new evidence in part because it determined that the

3  evidence did not meet the standard for consideration, therefore, "the new evidence did not become

4  part of the record, and we may not consider it."  743 F. App'x. at 146.

5  On the other hand, *Amor* is an unpublished Ninth Circuit case, and courts in this District

6  have previously held that new evidence before the Appeals Council "is part of the record the Court

7  must consider in determining whether the ALJ's decision is supported by substantial evidence."

8  *Linnehan v. Berryhill*, No. 17-CV-04146-JSC, 2018 WL 6267846, at *8 (N.D. Cal. July 31, 2018).

9  In Linnehan, the plaintiff submitted several documents, including medical records, to the Appeals

10  Council, and the Appeals Council decision likewise stated, "[w]e find this evidence does not show

11  a reasonable probability that it would change the outcome of the decision. We did not consider and

12  exhibit this evidence."  *Id.* at *7.  The court cited *Brewes* in support of the proposition that "the

13  Appeals Council cannot consider the evidence to conclude that it 'does not show a reasonable

14  probability that it would change the outcome of the decision' and then exclude the evidence from

15  the record based on the illogical conclusion that '[w]e did not consider and exhibit this evidence."

16  *Id.* at *8 (citation omitted).

17  Neither the Commissioner nor C.B. address the issue of whether it was proper for the

18  Appeals Council to forego exhibiting Dr. Snell's September 2020 letter or whether the Appeals

19  Council did in fact "consider" the letter as required by SSA regulations.  Because the Appeals

20  Council concluded that Dr. Snell's letter did not "show a reasonable probability that it would

21  change the outcome" of the ALJ's decision, and denied review, the Court finds that the Appeals

22  Council did "consider" the letter.  *See Linnehan*, 2018 WL 6267846, at *8.  Thus, the Court

23  incorporates Dr. Snell's letter into the administrative record and is bound to consider it in

24  determining whether the Commissioner's decision is supported by substantial evidence.  *See*

25  *Brewes*, 682 F.3d at 1159–60.

26  In terms of the substance of the letter, C.B. argues that Dr. Snell "explains in detail why a

27  2-day [CPET] could indicate significant functional impairments while a single treadmill test

28  would not."  ECF No. 19 at 22.  Dr. Snell also explains "the nature of [postexertional] malaise,"

how it makes CFS difficult to diagnose, and how following the 2-day [CPET], C.B. "experienced profound fatigue despite significant rest," "widespread aches and pain," and "was not recovered 7 days post-testing." *Id.*  The Commissioner notes that all these findings are covered in Dr. Snell's January 2021 letter and the CPET Evaluation Report, both of which were in the record before the ALJ.  ECF No. 24 at 23; *see* ECF No. 12-16 at 22–33.  That is, Dr. Snell compares the CPET to an exercise treadmill test (ECF No. 12-16 at 22–23), explains how some patients with CFS may not be "obviously ill-appearing during clinical evaluations," (*id.* at 24) and makes the exact same findings as to C.B.'s symptoms post-testing in the CPET Evaluation Report.  *Id.* at 30.  The Court held above that the ALJ's findings as to Dr. Snell's January 2021 letter and CPET Evaluation Report are not supported by substantial evidence in part because of the ALJ's failure to address these exact points when evaluating their consistency with the rest of the medical evidence of record.  Dr. Snell's September 2020 letter does not affect the Court's determination either way.

## IV.     CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REMANDS** for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: March 27, 2024

LISA J. CISNEROS
United States Magistrate Judge

*United States District Court*
*Northern District of California*